UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC KEITH RODGERS,

     Plaintiff,

                                      Case No. 23-cv-13211

v.                                    Hon. Matthew F. Leitman

REVIERT, *et al.*,

     Defendants.

_____/

### ORDER (1) GRANTING DEFENDANTS' MOTION TO DISMISS FEDERAL-LAW CLAIM (ECF No. 55) AND (2) DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE-LAW CLAIM

Prison is a very dangerous place for inmates who suffer from gender dysphoria ("GD")[1] – a condition involving conflict between one's gender identity and one's assigned sex at birth. Indeed, it is well-recognized that these inmates are especially vulnerable to being sexually assaulted by predators within the inmate population. That is why prison officials have a duty under the Eighth Amendment to avoid assigning GD inmates to share a cell with a known sexual predator and/or with an inmate who otherwise poses a substantial and known risk of sexual assault.

---

[1] The Court uses the abbreviation "GD" for both the noun "gender dysphoria" and the adjective "gender-dysphoric."

1

Plaintiff Eric Rodgers is a GD inmate in the custody of the Michigan Department of Corrections (the "MDOC") who was sexually assaulted in his cell by his cellmate (whose initials are C.M.).[2]  In this action, he alleges that three MDOC employees – Defendants Adam Douglas, Carolle Walker, and Steven Rievert[3] – violated his rights under the Eighth Amendment when they failed to protect him from that assault.  Specifically, Rodgers claims that C.M. posed a substantial risk of sexual assault to him (Rodgers), that Defendants knew of that risk, and that Defendants unreasonably failed to take the steps necessary to protect Rodgers from that risk – including removing C.M. from his cell.

The Defendants are entitled to qualified immunity from Rodgers' claim because it would not have been clear to every reasonable prison official in their positions that housing C.M. with Rodgers exposed Rodgers to a substantial risk of sexual assault.  C.M., like Rodgers, had been diagnosed with GD before he was assigned to Rodgers' cell.  Thus, C.M. was in the same vulnerable population as Rodgers.  And Rodgers, himself, has repeatedly acknowledged that GD inmates generally do *not* pose a known and substantial risk of sexual assault to one another.

---

[2] In his Complaint and other filings in this case, Rodgers uses he/him pronouns. Based on his use of those pronouns, the Court does the same here.

[3] Rodgers appears to have misspelled Rievert's name in his initial Complaint and that misspelling made its way into the case caption.  The Court spells Rievert's name as it is spelled in Rodgers' Second Amended Complaint and in Defendants' filings.

In fact, after C.M. was placed into Rodgers' cell, Rodgers (who did not know that C.M. had been diagnosed with GD) repeatedly indicated that replacing C.M. in the cell with another GD offender *would* be acceptable to him. Moreover, Rodgers does not claim that C.M. had any known history of sexual assault or predatory behavior at the time he was assigned to Rodgers' cell. And Rodgers never complained that C.M. engaged in any sexually inappropriate behavior while they were housed together prior to the assault. For all of these reasons, a reasonable prison official could have concluded that C.M. did not pose a substantial risk of sexual assault to Rodgers.

Indeed, the circumstances under which the sexual assault here occurred seem unusual. Rodgers has not cited a single case in which any GD inmate has ever claimed to have been sexually assaulted by another GD inmate. Nor has he cited any case in which the Supreme Court or Sixth Circuit has held that prison officials violated the Eighth Amendment by housing a GD inmate in proximity to another GD inmate (who had no history of sexual assault or predatory behavior). The absence of such authority confirms that Defendants are entitled to qualified immunity.

While the Court concludes that Rodgers' Eighth Amendment claim must fail, the Court feels compelled to note that it feels very badly for Rodgers and for the extreme trauma that he has endured. The Court cannot imagine the fear and pain he must have felt as C.M. brutally raped him as he was confined in his small cell. But

because Defendants are entitled to qualified immunity, the Court may not permit his Eighth Amendment claim to proceed. The Court therefore **GRANTS** Defendants' motion to dismiss that claim.

Rodgers has also brought a state-law claim against Defendants. Because the Court is dismissing Rodgers' lone federal claim, the Court declines to exercise supplemental jurisdiction over his state-law claim. Rodgers may pursue that claim in state court.

**I**

**A**

The MDOC has a policy concerning the management of inmates who present with symptoms of GD. (*See* MDOC Policy Directive 04.06.184, effective 06/26/2017 (the "GD Policy").)[4] A few provisions of the GD Policy are relevant to Rodgers' claim. The Court begins with a brief overview of those provisions.

The GD Policy begins by defining "gender dysphoria" as "[r]efer[ring] to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." (*Id.* at ¶ B.) The GD Policy next provides that "[w]hen making housing and programming assignments . . . facility

---

[4] Available at:
https://www.michigan.gov/corrections/-
/media/Project/Websites/corrections/Files/Policy-Directives/PDs-04-Institutional-
Operations/PD-0406-Medical-and-Mental-Health-Services/04-06-184-Gender-
Dysphoria-effective-06-26-17.pdf.

staff shall consider on a case-by-case basis whether a placement would compromise the prisoner's health and safety and any management or security concerns." (*Id.* at ¶ G.)

The GD Policy establishes a process for addressing inmates who are "believed to be or self-report[]" that they have GD. (*Id.* at ¶ K.)  At the first step, a mental health professional determines whether the inmate qualifies for a diagnosis of GD. *See id.*  If the inmate is diagnosed with GD, the inmate proceeds to the second step of the process during which the same mental health professional "shall formulate an individual management plan" for the inmate. (*Id.* at ¶ L.)  That plan "shall give consideration to," among other things, "[f]acility placement and housing in accordance with the Prison Rape Elimination Act (PREA) standards (generally single-occupancy cell)," "[a]ccess to toilet and shower facilities with relative privacy," and "[c]haracteristics of the prisoner, including stature, trauma history, tendency toward violence or predatory behavior, the likelihood of being a victim of violence or of predatory behavior or being a former victim." (*Id.*)  The plan must be "provided to . . . the appropriate Resident Unit Manager, and be included in the prisoner['s] health record." (*Id.* at ¶ M.)

**B**

Rodgers is currently incarcerated by the MDOC and has been diagnosed with GD. (*See* Sec. Am. Compl. at ¶¶ 1, 12, ECF No. 50, PageID.428, 430.)  In June of

5

2017, pursuant to the GD Policy, the MDOC implemented an individual management plan for Rodgers. (*See id.* at ¶ 12, PageID.430.)  With respect to housing, that plan called for "No Special Provisions." (Ind. Mgmt. Plan, ECF No. 1, PageID.23.)  Nevertheless, Rodgers alleges that beginning on June 18, 2018, the "MDOC ordered that [he] be housed in a single cell." (Sec. Am. Compl. at ¶ 14, ECF No. 50, PageID.430.)  That order changed in May of 2022.  At that time, Rodgers "was issued a Medical Detail Special Accommodation which contained the 'Restriction' that [he] was only to be 'Housed with another GD Offender.'" (*Id.* at ¶ 15.)  Thus, as of May of 2022, Rodgers' individual management plan permitted the MDOC to place him in a cell with another inmate who had also been diagnosed with GD.

In June of that year, Rodgers was transferred to the MDOC Saginaw Correctional Facility ("SCF"). (*See id.* at ¶ 17.)  When he arrived at SCF, Defendant Adam Douglas was the Warden of the facility, Defendant Carolle Walker was the Assistant Deputy Warden, and Defendant Steven Rievert was the Resident Unit Manager of Rodgers' assigned unit. (*See id.* at ¶¶ 3-5, PageID.428-429.)

Before Rodgers' arrival at SCF (and while he was housed at other MDOC facilities), he had been "sexually assaulted" by another inmate "in the prison shower," "confronted by an inmate requesting sexual favors," and physically "assaulted" more than one time. (*Id.* at ¶ 29, PageID.433.)  When he arrived at SCF,

6

he told Rievert about these prior assaults.  More specifically, he informed Rievert "that he had been sexually assaulted in prison before, was in fear of being sexually assaulted again, and requested a single person accommodation cell in accord with his Medical Detail Special Accommodations."[5] (*Id.* at ¶ 17, PageID.430.)

On or about October 28, 2022, another prisoner, C.M., "persuaded Defendant Rievert to transfer him to [Rodgers'] cell." (*Id.* at ¶ 18, PageID.431.)  C.M. was serving a lengthy sentence "because he stabbed a young child and a woman approximately eighty (80) times." (*Id.* at ¶ 19.)  Moreover, C.M. "had been in a fight with another prisoner shortly before he was moved into [Rodgers'] Security Level 2 cell," and he had previously been assigned a Security Level IV, indicating that he was "a heightened security risk." (*Id.* at ¶¶ 20-21.)  Rodgers adds that at the time Rievert transferred C.M. into his (Rodgers') cell, C.M. "had not been issued a Medical Detail Special Accommodation restricting him to a GD cellmate, nor had [C.M.] received an Individual Management Plan as a GD offender." (*Id.* at ¶ 22.)

Critically, however, while C.M. had not yet received an individual management plan or a special accommodation at the time he was moved to Rodgers' cell, C.M. *had been diagnosed with GD*.  Documents attached to Rodgers' own

---

[5] Rodgers' characterization of his Medical Detail Special Accommodations was not accurate.  As noted above, at the time Rodgers arrived at SCF, his special accommodations allowed him to be placed in a cell with another inmate who had also been diagnosed with GD.

pleadings make that clear. (*See* Email dated Jan. 13, 2023, ECF No. 1, PageID.33 (confirming that C.M.'s GD diagnosis "was entered on 8/17/2022"); MDOC Suicide Risk Assessment dated Nov. 3, 2022, ECF No. 1, PageID.38 (confirming that Rodgers was housed in a cell "with [a] bunkie who is also [GD] diagnosis").[6]) And Rodgers does not allege that C.M. was not a GD inmate at the time C.M. was transferred into his cell.[7] (*See generally* Sec. Am. Compl., ECF No. 50.)

## C

On November 3, 2022, less than one week after C.M. had been moved into Rodgers' cell, Rodgers reported to a prison clinician during a suicide risk assessment that he "[f]ear[ed] for [his] own safety." (*Id.* at ¶ 23, PageID.431.) Notably, however, the clinician's notes, which Rodgers attached to one of his pleadings, did

---

[6] The Defendants have submitted a form, dated August 17, 2022, on which an MDOC mental health professional formally diagnosed C.M. with GD. (*See* C.M. MDOC Healthcare Record dated Aug. 17, 2022, ECF No. 56.) Since that document is not attached to (or expressly mentioned in) Rodgers' own pleadings, it is not clear to the Court that it may be considered in the context of the pending motion. Perhaps there is an argument that Rodgers' pleadings somehow implicate the form and put the form squarely at issue such that it may be considered in connection with the pending motion. However, out of an abundance of caution, the Court has not considered that document as part of its analysis.

[7] As noted below, Rodgers sent a letter dated November 17, 2022, in which he said that C.M. was not a GD inmate. But he does not make such an allegation in his Second Amended Complaint – presumably because the documents attached to his own pleadings show that C.M. had been diagnosed with GD.

not tie Rodgers' fear for his safety to C.M.  On the contrary, the notes indicate that

Rodgers *denied that he feared an assault from C.M.*  In relevant part, the notes state:

> [Prisoner h]as been seen quarterly by mental health staff due to [GD] diagnosis.  Since being at SRF 6/30/2022, prisoner has continued to request single person accommodation even though does not have this designation any longer.  Currently locking in level II custody with bunkie *who is also [GD] diagnosis*.
>
> ***
>
> Prisoner had been seen earlier this date by Healthcare and had indicated having had a PREA assault in the past. Prisoner clarified this occurred in 2018 and is trying to get back on single person accommodation due to past sexual assault.  *Prisoner denied any current assault or threat of assault.*  Presents with fear of potential assault without any supporting evidence.  Stated has *new bunkie and no threats or statements against them*.

(MDOC Suicide Risk Assessment, ECF No. 1, PageID.38 (emphasis added).[8])

According to Rodgers, he made several additional efforts to make his fears

known.  First, two weeks after the suicide risk assessment, on November 17, 2022,

Rodgers wrote a letter to Rievert, Walker, and Douglas. (*See* Sec. Am. Compl. at ¶

24, ECF No. 50, PageID.431-432.)  In that letter, Rodgers said that he "fear[ed] for

[his] life" because he had been placed in a cell with C.M. who was "not" a "(GD)

---

[8] Rodgers does not allege that these notes – which, again, he attached to his pleadings – inaccurately described his statements during the suicide risk assessment. (*See generally* Sec. Am. Compl., ECF No. 50.)

Person." (Letter from Rodgers dated Nov. 17, 2022, ECF No. 1, PageID.51.) But Rodgers did not say that C.M. had engaged in any inappropriate behavior toward him or threatened him in any way. (*See id.*)

Second, also on November 17, 2022, Rodgers "went to Defendant Rievert and showed him his Accommodation and expressed his distress at having [C.M.] as a cellmate, but Defendant Rievert refused to talk about it." (Sec. Am. Compl. at ¶ 25, ECF No. 50, PageID.432.) Rodgers does not suggest that during this conversation he told Rievert that C.M. had engaged in any threatening or improper conduct.

Third, on November 22, 2022, Rodgers sent a kite to the mental health staff at SCF in which he stated that he "ha[d] a medical special accommodation only to be housed with another (GD) offender" and that his Resident Unit Manager (Rievert) had placed him with C.M. who was "not" GD. (Kite Resp. dated Nov. 22, 2022, ECF No. 1, PageID.52.) MDOC staff member LaRue (first name unknown) responded to that kite and told Rodgers that his "current housing status is correct" – meaning that his inmate *had* been diagnosed with GD. (*Id.*)

Finally, on November 23, 2022, Rodgers filed a grievance concerning his fear of being assaulted. (*See* Sec. Am. Compl. at ¶ 26, ECF No. 50, PageID.432.) That grievance stated that Rodgers was a GD inmate, that he had a special accommodation to be housed with only another GD inmate, and that Rievert had "refused to Investigate and Check" C.M.'s GD status before housing him with Rodgers.

(Grievance dated Nov. 23, 2022, ECF No. 1, PageID.40.) The grievance, like Rodgers' other complaints related to his being housed with C.M., did not state that C.M. had assaulted him or done anything wrong. (*See id.*)

**D**

"On the evening of November 23, 2022, the evening after [Rodgers] filed his Grievance, [C.M.], an estimated 290 pounds, choked [Rodgers], then pulled down [Rodgers'] pants and forcibly sodomized him." (Sec. Am. Compl. at ¶ 32, ECF No. 50, PageID.433.) Rodgers says that he notified Douglas and Walker of the attack and that that they nonetheless "allowed [C.M.] to remain in general population and interact with [Rodgers]." (*Id.* at ¶ 33.)

**E**

Rodgers' operative pleading is his Second Amended Complaint (ECF No. 50). In that pleading, he brings one federal claim and one state-law claim against Rievert, Walker, and Douglas.[9] In his federal claim, brought under 42 U.S.C. § 1983, he alleges that each of the Defendants "showed deliberate indifference to [his] Eighth

---

[9] An "Inspector Price" (first name unknown) was named as a Defendant in Rodgers' original complaint but is not named as a Defendant in the Second Amendment Complaint and is no longer a party to the case.

11

Amendment rights to be protected from *sexual* violence."[10] (*Id.* at ¶ 42, PageID.435 (emphasis added).)  In support of that claim, he alleges, among other things, that:

- "It is common knowledge in the correctional community, and Defendants knew, that GD … inmates are at a significantly increased risk of being sexually assaulted by other prisoners;"

- Defendants knew that he "had been diagnosed as GD and was therefore to receive housing assignments that minimized the risk of sexual assault" and that he had "expressed fear for his safety when [C.M.] was transferred to [his] cell;"

- Defendants knew that C.M. "was a violent prisoner who had been assigned Level [IV] status and had recently been in an altercation with another inmate" and "did not have an Individual Management Plan as a GD offender."

- Despite Defendants' "knowledge of [his] vulnerability, his fears, and [C.M.'s] aggressive background, Defendants did not respond to [Rodgers'] letter or take any other action to avert the threat that [C.M.] posed to [him];"

---

[10] During the hearing on Defendants' motion to dismiss, Rodgers' counsel confirmed that Rodgers' claim is based upon the alleged failure to protect Rodgers from *sexual* violence, not a failure to protect Rodgers from the more general risk of violence.

12

- Finally, each of the Defendants "had the authority and ability to prevent the transfer of [C.M.] to [his] cell and to order [C.M.]'s removal from the cell," yet they "took no action to protect [him] from sexual assault by [C.M.]." (*Id.* at ¶¶ 16, 27, 31, 40, 42, PageID.430-435.)

In his state-law claim, Rodgers alleges that the Defendants were grossly negligent in failing to take steps to protect him from sexual assault by C.M. (*See id.* at ¶¶ 48-52, PageID.436-437.)

**F**

On July 10, 2025, Defendants filed a motion to dismiss Rodgers' claims. (*See* Mot., ECF No. 55.)  In that motion, Defendants argue, among other things, that qualified immunity protects them from Rodgers' Eighth Amendment claim. (*See id.*, PageID.504.)  Defendants also ask the Court to decline supplemental jurisdiction over Rodgers' state-law claim, or in the alternative, to dismiss it for failure to state a claim. (*See id.*, PageID.509-514.)

For the reasons explained below, the Court grants Defendants' motion to dismiss because Defendants are entitled to qualified immunity on Rodgers' Eighth Amendment claim.  The Court declines to exercise supplemental jurisdiction over the state-law claim and will dismiss that claim without prejudice.

## II

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  In other words, "[t]he rule must be 'settled law,'" *id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (*per curiam*)), "which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority,'" *id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S 731, 741–42 (2011) (cleaned up)).

But a rule must be more than settled law to satisfy the "clearly established" standard.  That standard "also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S 194, 202 (2001)).  Stated another way, a rule setting forth a federal right is "clearly established" only if the rule is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11

(citation omitted). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 583 U.S. at 64 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). This standard "sets a high bar because it requires a plaintiff to identify with a 'high degree of specificity' the legal rule that a government official allegedly violated. *Beck v. Hamblen Cnty., Tennessee*, 969 F.3d 592, 599 (6th Cir. 2020) (quoting *Wesby*, 583 U.S. at 63)). To that end, a rule "must be particularized to the facts of the case" in order to satisfy the "clearly established" standard. *Id.* (citation omitted). That is why "'a body of relevant case law' addressing similar facts 'is usually necessary' to show a violation of a clearly established rule." *Id.* (quoting *Wesby*, 583 U.S. at 63).

While the Supreme Court has highlighted the need for specificity when identifying clearly established law in the Fourth Amendment context, *see Wesby*, 583 U.S. at 64, the Sixth Circuit has "extended" that demanding specificity requirement "to deliberate-indifference [failure-to-protect] claims" like the one Rodgers brings here. *Beck*, 969 F.3d at 600–01.[11] Thus, a plaintiff bringing a

---

[11] Because the plaintiff in *Beck* was a pretrial detainee, his deliberate-indifference failure-to-protect claim arose under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment (under which Rodgers' claim arises). However, the court in *Beck* proceeded on the assumption that the same standard applied to deliberate-indifference failure-to-protect claims under both the Eighth and Fourteenth Amendments. *See Beck*, 969 F.3d at 600–01.

deliberate-indifference failure-to-protect claim must identify a controlling case (or a substantial weight of persuasive authority) finding a viable claim under closely similar circumstances. *See id.*

## III

The Court now turns to the question of whether Rodgers has sufficiently alleged that the Defendants violated clearly established federal law.  For the reasons explained below, the Court concludes that he has failed to do so.

## A

The Court first evaluates whether there is any "settled law" that applies to Rodgers' deliberate-indifference failure-to-protect claim.  There is.

That settled law emanates from the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825 (1994), a case that bears some factual similarity to this case. The plaintiff in *Farmer*, whose assigned sex at birth was male, was diagnosed by the U.S. Bureau of Prisons as "a transsexual, one who has a rare psychiatric disorder in which a person feels persistently uncomfortable about his or her anatomical sex, and who typically seeks medical treatment, including hormonal therapy and surgery, to bring about a permanent sex change." *Farmer*, 511 U.S. at 828 (citation omitted). The defendants were officials with the Bureau of Prisons who were allegedly responsible for the plaintiff's institutional placement and housing assignments.  The plaintiff claimed that even though the defendants knew that "as a transsexual who

16

projects feminine characteristics, [she] would be particularly vulnerable to sexual attack," they placed her in the "general population" of a "penitentiary [that] had a violent environment and a history of inmate assaults." *Id.* at 831 (internal quotation marks omitted).  The plaintiff was thereafter "beaten and raped by another inmate in [her] cell." *Id.* at 830.  The plaintiff alleged that the defendants' conduct "amounted to a deliberately indifferent failure to protect [her] safety, and thus to a violation of [her] Eighth Amendment rights." *Id.* at 831.

The Supreme Court granted *certiorari* in the case in order "to define the term 'deliberate indifference'" and to clarify the requirements for a deliberate-indifference failure-to-protect claim. *Id.* at 829.  The Supreme Court first held that in order to "prove [a] deliberate indifference claim" based upon a failure to protect against "inmate on inmate violence," a plaintiff "must first establish an objective element: that [he] 'is incarcerated under conditions posing a substantial risk of serious harm." *Beck*, 969 F.3d at 600 (quoting *Farmer* and describing holding in *Farmer*).  The Supreme Court said that a plaintiff "next must establish a subjective element: that the government official subjectively knew of this risk of harm." *Id.* (quoting *Farmer* and further describing holding in *Farmer*).  Finally, the Supreme Court explained that a plaintiff "must lastly show that the official failed to respond [] reasonably to the risk." *Id.* (quoting *Farmer* and further describing holding in Farmer).

17

Long before the events giving rise to Rodgers' claim here, the Sixth Circuit recognized that "the constitutional right to be free from deliberate indifference to assault and sexual abuse was clearly established" by *Farmer* and its progeny. *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011). Thus, there is a clearly established rule that applies to Rodgers' claim. And he expressly identifies that *Farmer*-based rule as the clearly established federal law supporting his claim. (*See* Resp., ECF No. 59, PageID.538.)

**B**

The problem for Rodgers is that the clearly established rule on which he relies "fram[es] the deliberate indifference test" at a "high level of generality" and is therefore insufficient to "overcome [Defendants'] qualified immunity defense 'in the specific context of this case.'" *Beck*, 969 F.3d at 602–03 (quoting *Mullenix*, 577 U.S. at 16) (holding, in a deliberate-indifference failure-to-protect case, that the plaintiff's invocation of the clearly established rule from *Farmer* set forth above failed to overcome the defendants' qualified immunity defense). The objective component of that test is set forth at an especially high level of generality. As noted above, that component of the test focuses on whether an inmate faced "a substantial risk of serious harm." *Beck*, 969 F.3d at 600. But that component gives prison officials no guidance on how to determine exactly when a particular set of conditions poses such a risk. Indeed, the Supreme Court in *Farmer* expressly *declined* to

18

address that question. *See Farmer*, 511 U.S. at 834 n.3 ("At what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes is a question this case does not present, and we do not address it.")  And Rodgers has not cited a post-*Farmer* controlling decision in which the Supreme Court or Sixth Circuit has established a test for prison officials to apply in order to determine whether an inmate faces a substantial risk of serious assault under a given set of circumstances.  Because the rule on which Rodgers relies defines the objective component of deliberate indifference at a high level of generality, he must identify "'a body of relevant case law' addressing similar facts" that would have made clear to the Defendants that placing him in a cell with C.M. subjected him to a substantial risk of sexual assault. *Beck*, 969 F.3d at 599 (quoting *Wesby*, 583 U.S. at 63)).

He has not done so.  He has not cited a single case in which any court applying the objective component from *Farmer* has held – or even suggested – that placing a GD inmate in a cell with another GD inmate (who is not alleged to have been a predator) exposes the first GD inmate to a substantial risk of sexual assault.

The Court acknowledges that there may be some cases in which exposing an inmate to a certain set of conditions so obviously exposes the inmate to a substantial risk of sexual assault that he may be able to overcome a qualified immunity defense without citing prior controlling decisions with closely analogous facts. *See Wesby*, 583 U.S. at 49 (explaining that in a narrow set of cases, a plaintiff may be able to

satisfy the "clearly established" standard without citing analogous controlling authority if the plaintiff is able to show that the defendants' conduct amounted to an "obvious" violation of the plaintiff's federal rights). But this is not such a case. Rodgers has not plausibly alleged, nor has he convinced the Court, that GD inmates like him face a substantial risk of sexual assault from *other GD inmates* (like C.M.). On the contrary, his own conduct, as described in his pleadings, demonstrates that Rodgers, himself, believes that GD inmates generally do *not* pose a substantial risk of sexual assault to other GD inmates.  Indeed, Rodgers repeatedly indicated that he would accept another GD inmate as his cellmate. (*See* Letter from Rodgers dated Nov. 17, 2022, ECF No. 1, PageID.51; Kite Resp. dated Nov. 22, 2022, ECF No. 1, PageID.52; Grievance dated Nov. 23, 2022, ECF No. 1, PageID.40.)   Given Rodgers' own apparent view that he would *not* have faced a substantial risk of sexual assault from another GD inmate, he cannot now plausibly argue that he faced an obvious risk of such an assault from C.M.[12]

---

[12] As another Judge on this Court has observed, there is at least one published Sixth Circuit decision in which that court appeared to hold, in the context of a failure-to-protect claim, that the objective component of the *Farmer* deliberate-indifference test was satisfied by a showing that the inmate actually suffered serious harm – without assessing whether, before the harm was inflicted, the risk of suffering the harm was substantial. *See McCracken v. Haas*, 324 F.Supp.3d 939, 946 (E.D. Mich. 2018) (citing *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001)).   The Court respectfully declines to follow that approach because it is inconsistent with express holding in *Farmer* – requiring an assessment of the risk of harm – and with other published Sixth Circuit decisions that analyze whether the risk of harm was

For all of these reasons, Rodgers cannot satisfy the "clearly established" requirement of the qualified immunity standard, and Defendants are therefore entitled to qualified immunity on his deliberate indifference failure-to-protect claim.

## C

Rodgers offers several counterarguments. While they are thoughtful, the Court respectfully disagrees with each of them.

## 1

First, Rodgers suggests that the Sixth Circuit's decision in *Greene v. Bowles*, 361 F.3d 290 (6th Cir. 2004), gave Defendants clear notice that housing Rodgers with C.M. would amount to deliberate indifference under *Farmer*.[13] While there are

---

substantial. *See, e.g.*, *Bishop*, 636 F.3d at 766; *Reedy v. West*, 988 F.3d 907, 912–14 (6th Cir. 2021).

[13] During the hearing on Defendants' motion to dismiss, Rodgers' counsel identified *Greene* as the most closely on-point case. In his written response to Defendants' motion to dismiss, Rodgers also cited the unpublished district court decision in *Moon v. Leon*, No. 1:24-cv-1067, 2024 WL 4762999 (W.D. Mich. Nov. 13, 2024), which he suggested was closely on point, as further support for his contention that Defendants violated his clearly established rights. But as a single unpublished district court decision, *Moon* does not qualify as clearly established federal law. *See Hughes v. City of N. Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996) (explaining that, "as a general rule, a district court decision by itself cannot ordinarily clearly establish a law even of its own circuit."); *Eastep v. City of Nashville, Tennessee*, 156 F.4th 819, 833 (6th Cir. 2025) ("And, in the spirit of giving fair notice of conduct deemed to violate a constitutional right, unpublished decisions will not suffice to show that a right is clearly established.") (citing *Bell v. Johnson*, 308 F.3d 594, 611 (6th Cir. 2002)). In any event, *Moon* is materially distinguishable. There, prison officials twice housed a GD inmate in "open cube" settings along with the general population, including non-GD inmates. The GD inmate warned the prison officials that the other prisoners "were pressing her for sex and threatening her." *Moon*, 2024 WL 4762999,

undoubtedly some parallels between *Greene* and this case, there are also some significant distinctions.   In *Greene*, prison officials placed a medium-security transgender inmate in protective custody along with another "maximum security" inmate with a "long history of assaults on other inmates" and who was well known to be "predatory." *Id.* at 292.  The transgender inmate had been placed in protective custody "[b]ecause of her feminine appearance" and "to guard against attacks from other inmates." *Id.*   The predator "severe[ly] attack[ed]" the plaintiff, and the plaintiff brought a deliberate-indifference failure-to-protect claim against the prison warden. *Id.* at 292–93.  The district court granted summary judgment in favor of the warden on "the narrow ground" that the plaintiff failed to satisfy the subjective component of the *Farmer* test – *i.e.*, that the plaintiff "failed to introduce evidence from which a reasonable trier of fact could conclude that [the warden] knew of a substantial risk of serious harm to [the plaintiff]." *Id.* at 293.  The Sixth Circuit reversed.  It held that the plaintiff did submit evidence – including the warden's deposition testimony and prison records – sufficient to support a finding that the warden was aware of the serious risk that the predator inmate posed to the plaintiff. *See id.* at 294–95.  The Sixth Circuit concluded that the plaintiff should have been permitted to present her claim against the warden to a jury.

---

at *3.  The court held that under those circumstances – which are absent here – the plaintiff had stated a plausible deliberate-indifference failure-to-protect claim. *See id.* at *6.

*Greene* is materially distinguishable from this case because the attacker there – who the defendants placed in the same unit as the plaintiff – was a well-known predator, whereas Rodgers does not allege that C.M. had any history of predatory conduct.   While he alleges that C.M. "had been in a fight with another prisoner" before being placed into his cell (Sec. Am. Compl. at ¶ 20, ECF No. 50, PageID.431), he does not claim that C.M. was the aggressor in that altercation or that the altercation resulted from any predatory conduct by C.M.   Because Rodgers does not allege that C.M. was a predator like the attacker in *Greene*, the decision in *Greene* would not have made clear to the Defendants here that placing Rodgers with C.M. subjected Rodgers to a substantial risk of sexual assault.   Moreover, there is no suggestion in *Greene* that the attacker was GD, and that difference further suggests that *Greene* does not provide definitive guidance as to whether placing Rodgers with C.M. (who was GD) subjected Rodgers to an unreasonable risk of sexual assault. Finally (and least importantly), the attacker in *Greene* was a maximum-security inmate, whereas C.M. – who admittedly had a higher-level security classification at some relevant times (*see id.* at ¶ 21) – was not.[14]  Given the meaningful distinctions

---

[14] Rodgers alleges that before C.M. was placed into his cell, C.M. had been assigned a Level IV security classification. (*See* Sec. Am. Compl., at ¶ 21, ECF No. 50, PageID.431.)    In the MDOC, maximum security is Level V. (*See* MDOC, Correctional Facilities Administrations (CFA), available at: https://www.michigan.gov/corrections/our-operations/cfa.)

between *Greene* and this case, *Greene* cannot serve as clearly established law sufficient to overcome Defendants' qualified immunity defense, and dismissal of Rodgers' Eighth Amendment claim is therefore appropriate. *See Crawford v. Tilley*, 15 F.4th 752, 766 (6th Cir. 2021) ("[A] complaint distinguishable from our past cases on its face will not often survive a motion to dismiss on qualified immunity grounds.")[15]

**2**

Next, Rodgers argues that his communications to the Defendants expressing fear for his safety provide strong support for his claim. He emphasizes that in his November 17, 2022, letter to Defendants, he repeatedly stated "I fear for my life." (Letter from Rodgers dated Nov. 17, 2022, ECF No. 1, PageID.51.) The Kite Response from November 22, 2022, also noted that Rodgers said he "fear[ed] for [his] life." (Kite Resp. dated Nov. 22, 2022, ECF No. 1, PageID.52.) Rodgers

---

[15] In *Crawford*, the Sixth Circuit acknowledged its prior decisions in which it had stated that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Crawford*, 15 F.4th at 763 (citations omitted). The court explained that that statement was "at best imprecise." *Id.* And the court "clarif[ied]" that where a qualified immunity defense is raised, it is appropriate to dismiss the plaintiff's claims as unsupported by clearly established federal law where the claims are "distinguishable from [the court's] prior cases." *Id.* at 763–66. *See also Hester v. Chester Cnty., Tennessee*, 162 F.4th 780, 785 (6th Cir. 2025) (affirming dismissal of procedural due process claim on qualified immunity grounds where the plaintiff "failed to show that he had a protected liberty interest that was clearly established at the [relevant] time.")

suggests that these expressions of fear helped to establish that he faced a substantial risk of serious harm.

However, as an initial matter, it is not clear that Rodgers' *subjective* belief that C.M. posed a threat to him has any bearing on whether, as an *objective* matter, C.M.'s presence in his cell created a substantial risk of sexual assault. Further, Rodgers' communications to the Defendants did not identify any additional facts or circumstances that indicated he was objectively at risk of sexual assault. Most importantly, he did not describe any threatening or improper conduct by C.M. Moreover, as noted above, Rodgers' communications actually undermine his claim that he faced an objective serious risk of sexual assault from C.M. because in those communications he suggested a willingness to be housed with a GD inmate – which C.M. was. For these reasons, the Court rejects Rodgers' contention that his communications to the Defendants meaningfully support the objective component of his claim.

**3**

Third, Rodgers suggests that the risk to him of being housed with C.M. should have been obvious because C.M. "had not been issued a Medical Detail Special Accommodation restricting him to a GD cellmate or an Individual Management Plan as a GD offender." (Resp., ECF No. 59, PageID.532.) But whether C.M. had been issued his own special accommodation is far less significant than the fact that he had

25

been diagnosed as GD.  As explained above, under the GD Policy, inmates claiming to have GD go through a process.  The first step of that process is diagnosis, and the subsequent steps involve developing special accommodations and an individual management plan. (*See* MDOC Policy Directive 04.06.184 at ¶¶ K–N.)  Here, as described in detail above, the documents attached to Rodgers' own pleadings show that C.M. had been diagnosed with GD.  The fact that C.M. had not completed the second step of the process under the GD Policy does not somehow suggest that he should have been recognized as a threat to Rodgers.  Moreover, placing C.M. in Rodgers' cell was consistent with Rodgers' own special accommodations and individual management plan – which allowed him to be housed with another inmate who had been diagnosed with GD but did not require him to be housed with a GD inmate who had his own special accommodations and individual management plan. (*See* Sec. Am. Compl. at ¶ 15, ECF No. 50, PageID.430; Ind. Mgmt. Plan, ECF No. 1, PageID.23; Rodgers' MDOC Medical Detail Special Accommodations, ECF No. 1, PageID.25.)  For all of these reasons, the fact that C.M. may not have had his own special accommodations and individual management plan at the time he was placed into Rodgers' cell does not meaningfully change the qualified immunity calculus here and does not overcome Defendants' qualified immunity defense.

26

**4**

Next, Rodgers highlights that he was much older than C.M., that he weighed substantially less than C.M., that he had been sexually assaulted in prison before, and that C.M. had a previous high security level and had been convicted of a violent offense.  Rodgers insists that these circumstances show that he faced a substantial risk of sexual assault from C.M.

This is a serious argument.  As Rodgers reasonably notes, courts have often cited similar circumstances in support of their conclusion that a plaintiff has established that he faced a substantial risk of sexual assault from another inmate housed in proximity to him. *See, e.g.*, *Bishop*, 636 F.3d at 766 (considering the fact that perpetrator was "older, stronger," and had been "incarcerated for violent felonies including sexual assault" as relevant to the objective component); *McCracken v. Haas*, 324 F.Supp.3d 939, 942, 946 (E.D. Mich. 2018) (comparing the plaintiff, "a twenty-two year old, 130 pound man" whose "lower left leg was amputated," with the perpetrator, a "twenty-seven year old, 234 pound man" who was "incarcerated for committing sexual violence against multiple children").

But the line of cases cited by Rodgers is distinguishable in two important respects.  First, the perpetrators in those cases were known predators and/or had a history of sexual assault against vulnerable victims. *See Bishop*, 636 F.3d at 766 (highlighting that attacker was a "predatory inmate"); *McCracken*, 324 F.Supp.3d at

27

942 (noting that attacker was "incarcerated for committing sexual violence against multiple children").  Here, Rodgers does not allege that C.M. was a predator or had a similar history of sexual violence against vulnerable victims.  Second, there is no suggestion in those cases that the attacker was, like C.M., a member of same vulnerable GD population as the victim.  Given these substantial distinctions, the cases cited by Rodgers are not closely enough on point to have clearly established that Rodgers faced a serious risk of sexual assault from C.M.

**5**

Finally, Rodgers highlights that the Defendants allowed C.M. to continue to interact with him – in general population areas of the prison – after C.M. sexually assaulted him. (*See* Resp., ECF No. 59, PageID.543.)  According to Rodgers, that conduct by Defendants "may be circumstantial evidence of a deliberately indifferent state of mind." (*Id.*)  But what Defendants allegedly did after C.M. assaulted Rodgers says nothing about whether, as an objective matter, C.M. posed a substantial risk of sexual assault to Rodgers when C.M. was placed in Rodgers' cell.   Thus, Defendants' alleged post-assault conduct is not enough to save Rodgers' Eighth Amendment claim.

**D**

In sum, Rodgers has not shown that it was clearly established that placing him (and keeping him) in the same cell as C.M. exposed him to a substantial risk of

sexual assault. All three Defendants are therefore entitled to qualified immunity on Rodgers' Eighth Amendment failure-to-protect claim.

### IV

For the reasons explained above, the Court **GRANTS** Defendants' motion to dismiss Rodgers' Eighth Amendment deliberate-indifference claim. Given the decision to dismiss Rodgers' sole federal claim, the Court declines to exercise supplemental jurisdiction over Rodgers' state-law gross negligence claim. *See Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996) ("After a 12(b)(6) dismissal, there is a strong presumption in favor of dismissing supplemental claims."). Rodgers' state-law claim is therefore **DISMISSED WITHOUT PREJUDICE**.

    **IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: March 30, 2026

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 30, 2026, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126
